**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

-----------------------------------------------------------

|  |  |
|---|---|
| DAVID NATHANSON on behalf of himself and his minor children, D.N. and G.N., | |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| UNITED STATES OF AMERICA WRESTLING ASSOCIATION, INC. and MINNESOTA UNITED STATES OF AMERICA WRESTLING INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

-----------------------------------------------------------

Plaintiffs, DAVID NATHANSON, D.N., and G.N. by and through their undersigned counsel, EISENBERG & BAUM, LLP and THE MINNESOTA DISABILITY LAW CENTER, for their Complaint against Defendants, UNITED STATES OF AMERICA WRESTLING ASSOCIATION, INC. and MINNESOTA UNITED STATES OF AMERICA WRESTLING INC., hereby allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs, DAVID NATHANSON, D.N., and G.N., are deaf individuals who communicate primarily in American Sign Language ("ASL"), which is their expressed, preferred, and most effective means of communication. David Nathanson is a wrestling coach for "THE ASL EAGLES," a youth wrestling club chartered under the governance

1

and bylaws of Defendants UNITED STATES OF AMERICA WRESTLING ASSOCIATION, INC. and MINNESOTA UNITED STATES OF AMERICA WRESTLING, INC. David Nathanson's minor sons, D.N. (DOB: 1/12/2006) and G.N. (DOB: 2/22/2008) are wrestlers for The ASL Eagles. The majority of the athletes, coaches, and family members of The ASL Eagles are deaf individuals.

2.      Plaintiffs have made repeated requests for Defendants to provide Plaintiffs with  qualified sign language interpreters at Defendants' wrestling competitions and meetings so that Plaintiffs, and other deaf team members can effectively communicate with administrators, referees, coaches, judges, competition officials, and medical staff in the same manner as hearing, non-disabled coaches, and participants. Despite these requests, Defendants have continuously refused and/or failed to accommodate Plaintiffs' disability. Through this discriminatory treatment, Plaintiffs have learned that Defendants' wrestling competitions and assemblies are inaccessible to deaf individuals.

3.      Effective communication is especially more important in wrestling matches because wrestling is an extremely physical and dangerous sport that can cause severe injuries. Without qualitied sign language interpreters Plaintiffs and other deaf injured players in The ASL Eagles cannot communicate effectively with medical professionals for timely and effective treatment.

4.      Defendants discriminated against Plaintiffs unlawfully, on the basis of Plaintiffs' disability of deafness, by refusing to provide the ASL interpreters that Plaintiffs require to communicate during wrestling competitions and organization meetings. Plaintiffs bring this action to compel Defendants to cease unlawful discriminatory practices

and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity for people who are deaf to participate in Defendants' wrestling competitions and meetings. Plaintiffs seek declaratory, injunctive and equitable relief; compensatory, treble, and punitive damages; and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*; Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794; the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*; and other state and common law causes of action.

## THE PARTIES

5.     Plaintiff DAVID NATHANSON brings this action and is an individual residing in St. Paul, Minnesota. DAVID NATHANSON is a profoundly deaf individual who primarily communicates in ASL, and he is substantially limited in the major life activities of hearing and speaking within the meaning of federal and state anti-discrimination laws.

6.     Plaintiff D.N. is a minor child residing in St. Paul, Minnesota. D.N. is a profoundly deaf individual who primarily communicates in ASL, and he is substantially limited in the major life activities of hearing and speaking within the meaning of federal and state anti-discrimination laws. DAVID NATHANSON brings this action on behalf of himself and his son D.N.

7.     Plaintiff G.N. is a minor child residing in St. Paul, Minnesota. G.N. is a profoundly deaf individual who primarily communicates in ASL, and he is substantially

limited in the major life activities of hearing and speaking within the meaning of federal and state anti-discrimination laws. DAVID NATHANSON brings this action on behalf of himself and his son G.N.

8.    Defendant   UNITED   STATES   OF   AMERICA   WRESTLING ASSOCIATION, INC. ("USA Wrestling") is the national governing body for amateur wrestling in the United States. The principal office of the corporation is located in Colorado Springs, Colorado.

9.    Defendant MINNESOTA UNITED STATES OF AMERICA WRESTLING INC. ("MNUSA") is the state affiliate organization for USA Wrestling, as such is responsible for promoting, governing, and developing amateur wrestling programs in the State   of   Minnesota.   The   principal   office   of   the   corporation   is   located Minneapolis, Minnesota.

10.    To conduct their wrestling competitions and organizational meetings, USA Wrestling and MNUSA, own, operate and/or lease gymnasiums, arenas, places of exercise, and public gatherings which are places of public accommodation as defined by Title III of the ADA, 42 U.S.C. § 12181-12189. Upon information and belief, Defendants are recipients of federal financial assistance.

## JURISDICTION & VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiffs' claims arising under federal law.

12.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendants have   sufficient   contacts   with   this   District   to   subject   them   to   personal

jurisdiction at the time this action is commenced, and the acts and omissions giving rise to this Complaint occurred within this District.

## STATEMENT OF FACTS

13.     Plaintiffs David Nathanson, D.N., and G.N. are profoundly deaf individuals whose first and primary language is ASL.

14.     Plaintiffs' deafness impacted their ability to learn and acquire the English language from an early age, and as a result, Plaintiffs have difficulty communicating in English.[1] As such, note writing in English is not an effective communication for them in

---

[1] For someone whose primary language is ASL, communicating in English is not always effective because "ASL is not a visual representation of the English alphabet or English vocabulary. It is an entirely separate language with its own syntax and grammar that [is] described as 'closer to Chinese than English.'" *Heyer v. U.S, Bureau of Prisons*, 984 F.3d 347, 2021 U.S. App. LEXIS 885, at *3 (4th Cir. 2021). "Unlike English, ASL has no generally accepted written form." *Id.* At *4. Rather, "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1105 (9th Cir. 2010). "In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *Id.* As such, "[t]o deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language." *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017). Due to physical, environmental, and pedagogical factors, many deaf individuals have difficulty acquiring spoken languages such as English. *See Heyer*, 2021 U.S. App. LEXIS 885, at *3 ("Those born deaf or who become deaf early in life face unique barriers to learning English."). "As a result, most Deaf high-school graduates communicate in written English at the third-grade level." *Id.* at *4. This is because many deaf people acquire English as their second language (after ASL or another form of sign language) well past the critical developmental period of language acquisition. *Id.* (Most Deaf individuals have 'limited language exposure in early childhood' and 'grow up in a linguistically impoverished and deprived environment,' making acquisition of English skills more difficult.").

complex situations.[2] Plaintiffs are likewise unable to effectively communicate by reading lips.[3]

15.     David, D.N., and G.N. are members of The ASL Eagles.

16.     The ASL Eagles is a Minnesota based youth wrestling club chartered under the governance and bylaws of Defendants.

17.     The ASL Eagles is a predominantly deaf wrestling club, consisting of approximately sixteen (16) deaf athletes and four (4) deaf coaches.

18.     Accordingly, members of The ASL Eagles, including Plaintiffs, require interpreters to effectively communicate during wrestling tournaments and meetings.

---

[2] For someone whose primary language is not English, note writing is only effective when the situation "call[s] for little interactive communication." U.S. Dep't of Justice, Civil Rights Div., ADA Business BRIEF: Communicating with People Who Are Deaf or Hard of Hearing in Hospital Settings, https://bit.ly/2Oa4X8I. For example: "[S]ituations that do not involve substantial conversation" such as "blood work for routine lab tests or regular allergy shots," 28 C.F.R. Part 35 App. A; or "[B]rief and relatively simple face-to-face conversations, such as a visitor's inquiry about a patient's room number or a purchase in the gift shop or cafeteria." U.S. Dep't of Justice, Civil Rights Div., ADA Business BRIEF: Communicating with People Who Are Deaf or Hard of Hearing in Hospital Settings, https://bit.ly/2Oa4X8I. But "[f]or more complex or lengthy exchanges, more advanced aids and services are required"—not suggested, but required. U.S. Dep't of Justice, Title II Technical Assistance, ADA Best Practices Tool Kit for State and Local Governments – Ch. 3, A. Providing Equally Effective Communication, https://bit.ly/33aWTed (Feb. 27, 2007).

[3] Lip-reading, or the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication and is no substitute for direct communication through a qualified sign language interpreter. Only a small number of spoken sounds in aural language are visible, and many of those words appear identical on the lips. Even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, he or she would still not necessarily understand the English language as English and ASL are distinct languages with disparate grammatical structures.

Numerous local tournaments have provided The ASL Eagles with interpreters; however, other tournaments sponsored by Defendants have consistently refused to make this accommodation.

19.    Upon information and belief, Defendants have consistently communicated to local wrestling tournament hosts and interpreter agencies that Defendants and local hosts are not responsible for providing and paying for interpreters to attend wrestling tournaments to assist deaf individuals.

20.    For example, upon information and belief, representatives from MNUSA attended a local tournament held in Apple Valley, Minnesota on or about November 16, 2019. At the tournament, interpreters interpreted for Plaintiffs and other deaf persons. During the tournament, MNUSA representatives communicated to the interpreters that MNUSA will not pay for the interpreter services because they are not responsible for such accommodations. Interpreters informed Plaintiffs of their experience with MNUSA.

## DAVID NATHANSON

21.    Plaintiff David Nathanson is a coach for The ASL Eagles.

22.    Prior to the start of any wrestling competitions, all coaches attend a meeting. Upon information and belief, these meetings ordinarily discuss the rules and schedule of the competition. Accordingly, David Nathanson requires a sign language interpreter during these meetings to understand what is being communicated and to ask questions.

23.    During wresting competitions, coaches constantly have to communicate with tournament referees, judges, announcers, other officials and coaches from competing teams. Upon information and belief, the aforementioned communications are complex and

fast-paced as the communications typically happen during an ongoing wrestling match. Accordingly, Plaintiff David Nathanson requires an interpreter to be able to communicate during these face-paced interactions.

24.     Effective communication is especially more important in wrestling matches, because wrestling is an extremely physical and dangerous sport that can cause severe injuries. Players have to wrestle in multiple matches, often back-to-back, through an entire tournament that may last for days. This greatly fatigues players' bodies and increases the risk of injury. Players are exposed to all types of severe injuries, such as sprains, bruises, dislocations, fractures, concussions, tongue cuts, and various injuries in joints. In these medical or emergency situations, Plaintiff and the injured deaf players must be able to communicate effectively with medical professionals for timely and effective treatment. Accordingly, Plaintiff David Nathanson requires an interpreter to be able to communicate during these complex medical interactions.[4]

---

[4] Note writing in English is not an effective communication for deaf individuals during these emergency medical situations. For example, "[i]n a retail setting, pointing to product information or writing notes back and forth to answer simple questions about a product may allow a person who is deaf to decide whether to purchase the product"; however, where more complex information is communicated, like "[i]n a doctor's office, an interpreter generally will be needed for taking the medical history of a patient who uses sign language or for discussing a serious diagnosis and its treatment options." U.S. Dep't of Justice, Effective Communication, https://www.ada.gov/effective-comm.htm (Jan. 31, 2014); *see also Silva v. Baptist Health S. Fla., Inc*., 856 F.3d 824, 837 n.8 (11th Cir. 2017) ("[T]he exchange of written notes is not appropriate 'when the matter involves more complexity, such as in communication of medical history or diagnoses, in conversations about medical procedures and treatment decisions, or in communication of instructions for care at home or elsewhere.'") (quoting 28 C.F.R. Pt. 36, App. A (Sept. 15, 2010)); *Bustos v. Dignity Health*, 2019 U. S. Dist. LEXIS 129969, *7-8, 2019 WL 3532158 ("For instance, a deaf patient 'may need a qualified interpreter to discuss with hospital personnel a diagnosis, procedures, tests, treatment options, surgery, or prescribed medication[,]"

25.     Plaintiff David Nathanson must attend various training and board meetings held by Defendants to stay up to date with the latest wrestling rules, regulations, and news within Defendants' organizations. Plaintiff David Nathanson requires an interpreter during these complex and lengthy meetings and trainings to understand what is being communicated and to ask questions as well.

26.     Writing is not an effective form of communication in the competition setting for Plaintiff David Nathanson, as writing does not allow Plaintiff to communicate in real time during ongoing matches and requires him to communicate outside of his native language.

## D.N. and G.N.

27.     Plaintiffs D.N. and G.N. are youth wrestlers for The ASL Eagles.

28.     During wrestling competitions, wrestlers must understand the rulings and instructions made by officiants during the matches. Upon information and belief, the aforementioned communications are complex and fast-paced as the communications occur during an ongoing wrestling match. Accordingly, Plaintiffs D.N. and G.N. require an interpreter to understand what is being communicated.

29.     During wrestling competitions, wrestlers can get severely injured. Medical communications are complex, and the injured players must be able to communicate effectively with medical professionals for timely and effective treatment. Accordingly,

---

whereas a person with the same disability 'who purchases an item in the hospital gift shop may need only an exchange of written notes to achieve effective communication.'") (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 n.5 (11th Cir. 2012)).

Plaintiffs D.N. and G.N. require an interpreter to understand what is being communicated during these complex medical situations.

30.     During wrestling competitions, announcers often make announcements over an intercom speaker to communicate the time and location of where a player is to compete. Because Plaintiffs D.N. and G.N are deaf, they cannot hear the intercom announcements. Accordingly, Plaintiffs require an interpreter to understand the announcements made over the intercom.

31.     Writing is not an effective form of communication in the competition setting for Plaintiffs D.N. and G.N., as writing does not allow Plaintiffs to communicate in real time during ongoing matches and requires them to communicate outside of their native language.

## PLAINITFFS' REQUESTS FOR AN INTERPRETER

32.     Due to the communication barriers that Plaintiffs face during wrestling matches and meetings, Plaintiffs have repeatedly requested Defendants to provide Plaintiffs with sign language interpreters to allow Plaintiffs to communicate during wrestling competitions and meetings in the same manner as non-disabled, hearing individuals communicate.

33.     Plaintiffs' numerous requests for interpreters, include, but are not limited to the following dates:

### January 2018 Competition

34.     On or about November 17, 2017, Plaintiff David Nathanson emailed Jacob Quade to request interpreters for a January 14, 2018 wrestling tournament in Lake Crystal,

Minnesota which was sanctioned by Defendants. Upon information and belief, Mr. Quade was the host of the local wrestling competition.

35.     In the email, Plaintiff David Nathanson informed Mr. Quade that Plaintiffs and other deaf wrestlers and coaches planned on attending the tournament and providing ASL interpreters was necessary for Plaintiffs and other deaf team members to effectively communicate during the competition.

36.     Mr. Quade denied Plaintiff David Nathanson's request for an interpreter and informed Plaintiff that MNUSA recommended that Plaintiffs and other deaf team members write notes to communicate during the wrestling tournament.

37.     Plaintiff David Nathanson emailed Dale Schmitz, who upon information and belief was the CEO of MNUSA, and Bill Hickney, who upon information and belief was the chairman of the MNUSA Board of Directors, to express his frustration with Mr. Quade's refusal to provide Plaintiffs with an interpreter.

38.     Upon information and belief, despite Plaintiff David Nathanson's requests for an interpreter, neither Mr. Quade nor MNUSA agreed to provide Plaintiffs with an interpreter.

39.     Without an interpreter, Plaintiffs and other deaf members of The ASL Eagles cannot adequately communicate with or ask questions to competition officials, administrators, referees, coaches, judges, announcers, and medical staff. Plaintiffs would also have difficulty deciphering the times and locations of each wrestling match. Moreover, in case of players' injuries or emergency situations, Plaintiffs would not be able to communicate effectively with medical staff.

40.     As a result of Defendants' actions, Plaintiffs and The ASL Eagles could not attend the wrestling tournament and Plaintiffs missed opportunities to earn wrestling points to qualify for future matches and state competitions.

## January 2019 Competition

41.     On or about January 6, 2019, MNUSA sanctioned a state qualifying tournament held in Stewartville, Minnesota.

42.     Prior to the tournament, on January 4, 2019, Plaintiff David Nathanson emailed Dale Schmitz to inform Mr. Schmitz that The ASL Eagles would be participating in the tournament and request that MNUSA provide ASL interpreters for the tournament so that Plaintiffs and other deaf team members and coaches could effectively communicate during the tournament.

43.     Despite this request for a reasonable accommodation, Mr. Schmitz refused to provide Plaintiffs with an interpreter and informed Plaintiff David Nathanson that Plaintiffs will have to communicate by writing notes.

44.     Additionally, Mr. Schmitz informed Plaintiff David Nathanson that if Plaintiffs want to bring an interpreter, Plaintiffs would be responsible for the arrangement.

45.     Upon information and belief, despite Plaintiff David Nathanson's requests for an interpreter, MNUSA did not agree to provide Plaintiffs and The ASL Eagles with an interpreter.

46.     Without an interpreter, Plaintiffs and other deaf members of The ASL Eagles cannot adequately communicate with or ask questions to competition officials, administrators, referees, coaches, judges, announcers, and medical staff. Plaintiffs would

also have difficulty deciphering the times and locations of each wrestling match. Moreover, in case of players' injuries or emergency situations, Plaintiffs would not be able to communicate effectively with medical staff.

47.     As a result of Defendants' actions, Plaintiffs and The ASL Eagles could not attend the wrestling tournament and Plaintiffs missed opportunities to earn wrestling points to qualify for future matches and state competitions.

## March 2020 State Tournament

48.     Defendants sponsor an annual state wrestling tournament.

49.     The ASL Eagles attended the state tournament that took place on or about March 7, 2020 in Rochester, Minnesota.

50.     Prior to the tournament, Plaintiff David Nathanson informed Defendants that The ASL Eagles would be participating in the tournament and requested that Defendants provide ASL interpreters for the tournament so that Plaintiffs and other team members and coaches could effectively communicate during the tournament.

51.     Plaintiff David Nathanson understood that Defendants agreed to allow and pay for the interpreters as long as Plaintiff David Nathanson made the necessary arrangements to secure the interpreters.

52.     Plaintiff David Nathanson then made the necessary arrangements for the interpreters to attend the tournament.

53.     Several ASL wrestlers and deaf coaches participated in the tournament, including Plaintiffs.

54.     After the tournament, the interpreters contacted Plaintiff David Nathanson and informed him that Defendants refused to pay the interpreters for their work during the State Tournament.

55.     On or about March 13, 2020, Tom Kuisle, who by information and belief was a member of the MNUSA Board of Directors, emailed The ASL Eagles to inform the team that MNUSA was not obligated to hire interpreters and will not pay the interpreter invoices.

56.     Additionally, on or about March 13, 2020, Plaintiff David Nathanson emailed Tony Black, who by information and belief was the Director of State Services for USA Wrestling, to inquire about Defendants' obligation to provide interpretive services. Mr. Black informed Plaintiff that USA Wrestling is not responsible for the expense of ASL interpreters.

**October 2020 Meeting**

57.     On or about October 25, 2020, MNUSA Board of Directors held a board meeting. Club coaches were invited to attend the meeting.

58.     Prior to this meeting, Plaintiff David Nathanson requested an interpreter so that Plaintiff could understand what was being communicated during the meeting like other non-disabled, hearing coaches.

59.     Despite this request, no interpreter was provided, thus Plaintiff David Nathanson was unable to attend the meeting.

**February 2021 Meeting**

60.     On or about February 3, 2021, MNUSA Board of Directors held a board meeting via Zoom Video Conferencing. Club coaches were invited to attend the meeting.

61.     Prior to this meeting, Plaintiff David Nathanson emailed Tom Kuisle to request an interpreter so that Plaintiff could understand what was being communicated during the meeting like other non-disabled, hearing coaches.

62.     Plaintiff David Nathanson attended the meeting, observed that no interpreter was present, and again requested an interpreter.

63.     Despite Plaintiff David Nathanson's requests, no interpreter was provided to Plaintiff. Consequently, Plaintiff left the meeting early because he did not understand what was being communicated.

## DEFENDANTS' OBLIGATION

64.     For all the aforementioned interactions, Defendants knew or should have known of their obligations under the ADA, RA, MHRA, and their equivalents to develop policies, procedures, and practices to ensure their compliance with these statutes and to provide reasonable accommodations, including but not limited to the provision of ASL interpreters to ensure effective communication with deaf persons.

65.     Defendants' actions and/or inactions caused Plaintiffs fear, anxiety, indignity, humiliation, and emotional distress.

66.     Defendants knew or should have known that their actions and/or inactions created an unreasonable risk of causing Plaintiffs greater levels of anxiety, indignity,

humiliation, and/or emotional distress than a hearing person would be expected to experience.

67.     Because of Defendants' actions and/or inactions, Plaintiffs are exposed to greater danger than hearing persons because Plaintiffs cannot communicate effectively with medical staff in emergency or medical situations.

68.     Plaintiffs are entitled to equal access to wrestling competitions and assemblies offered by Defendants as are enjoyed by non-disabled persons.

69.     Nonetheless, Defendants prevented Plaintiffs from equal participation at Defendants' wrestling competitions and assemblies by failing to provide interpreters necessary for Plaintiffs' participation.

70.     In doing so, Defendants intentionally discriminated against Plaintiffs and acted with deliberate indifference to their federally and state protected rights.

71.     Defendants' wrongful and intentional discrimination against Plaintiffs on the basis of their disability is reflected by Defendants' failure to train employees and promulgate policies of non-discrimination against deaf individuals.

72.     Plaintiffs are current members of The ASL Eagles and therefore continue to be harmed by Defendants' conduct.

73.     Plaintiffs and The ASL Eagles intend to continue to participate in Defendants' future tournaments and organizational assemblies if Defendants provide interpreters for effective communication.

74.     Based on Defendants' actions and communications with Plaintiffs, Plaintiffs understand that Defendants will not provide interpreters for the future tournaments and meetings that Plaintiffs and other members of The ASL Eagles intend on attending.

75.     Accordingly, Plaintiffs and other members of The ASL Eagles will not have the same opportunity to participate in Defendants' future tournaments and meetings as other non-disabled, hearing individuals.

## CLAIM 1: VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

76.     Plaintiffs repeat and reallege all preceding paragraphs in support of this claim.

77.     At all times relevant to this action, Title III of the ADA, 42 U.S.C. § 12181, *et seq.*, has been in full force and effect and has applied to Defendants' conduct.

78.     At all times relevant to this action, the United States Department of Justice regulations implementing Title III of the ADA, 28 C.F.R. Part 36, have been in full force and effect and have applied to Defendants' conduct.

79.     At all times relevant to this action, Plaintiffs have been substantially limited in the major life activities of hearing and speaking and are individuals with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

80.     Defendants own, lease, and/or operate a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(D).

81.     Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services,

17

facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

82.     Title III of the ADA further provides that "[i]t shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

83.     Title III of the ADA further defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

84.     Title III of the ADA further defines discrimination to include "a failure to remove architectural barriers, and communication barriers that are structural in nature, in existing facilities . . . where such removal is readily achievable," or "where an entity can demonstrate that the removal of a barrier . . . is not readily achievable a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv–v).

85.     Federal regulations implementing Title III of the ADA provide that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

86.     Defendants discriminated against Plaintiffs on the basis of disability, in violation of Title III of the ADA and its implementing regulations, as set forth above.

87.     Absent injunctive relief, there is a clear risk that Defendants' actions will recur in the future to the harm of Plaintiffs and/or additional deaf persons.

88.     Plaintiffs are therefore entitled to injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1).

## CLAIM 2: VIOLATIONS OF
## SECTION 504 OF THE REHABILITATION ACT

89.     Plaintiffs repeat and re-allege all preceding paragraphs in support of this claim.

90.     At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 has been in full force and effect and has applied to the Defendants' conduct.

91.     At all times relevant to this action, Plaintiffs have had a substantial limitation to the major life activities of hearing, speaking, and reading, and have been individuals with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9).

92.     At all times relevant to this action, Defendants have been a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

93.     Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

94.     Defendants subjected Plaintiffs to discrimination, solely on the basis of disability, in violation of 29 U.S.C. § 794.

95.     Absent injunctive relief, there is a clear risk that Defendants' actions will recur in the future to the harm of Plaintiffs and/or additional deaf persons.

96.     Plaintiffs are therefore entitled to compensatory damages, injunctive relief, and an award of attorney's fees, costs, and disbursements, pursuant to 29 U.S.C. § 794(a).

## CLAIM 3: VIOLATIONS OF THE MINNESOTA HUMAN RIGHTS ACT (PUBLIC ACCOMODATIONS)

97.     Plaintiffs repeat and reallege all preceding paragraphs, in support of this claim.

98.     Minn. Stat. § 363A.11 states "It is an unfair discriminatory practice:(1) to deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of race, color, creed, religion, disability, national origin, marital status, sexual orientation, or sex, or for a taxicab company to discriminate in the access to, full utilization of, or benefit from service because of a person's disability."

99.     Minn. Stat. § 363A.11, subd. 2(1)(ii) states that it is discriminatory to "afford an individual or class of individuals on the basis of the disability of that individual or class,

directly or through contractual, licensing, or other arrangements, with the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations that are not equal to those afforded to other individuals.

100.    Discrimination includes the "failure to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to afford the goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities" and the "failure to take all necessary steps to ensure that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." Minn. Stat. § 363A.11 subd 3(2); Minn. Stat. § 363A.11 subd 3(3).

101.    Plaintiffs are persons with a "disability" within the meaning of Minn. Stat. § 363A.03, subd. 12.

102.    Defendants are an entity covered by the MHRA. Minn. Stat. § 363A.03, subd. 34.

103.    Defendants violated the MHRA by discriminating against Plaintiffs.

104.    Defendants denied Plaintiffs the opportunity to benefit from their services, privileges, advantages, and accommodations that were equal to that afforded to other individuals who are not deaf in violation of the MHRA. Minn. Stat. § 363A.11, *et seq*.

105.    Absent  injunctive relief, there is a clear risk that Defendants' actions will recur in the future to the harm of Plaintiffs and/or additional deaf persons.

106.    Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the MHRA.

107.   As a result of Defendants' discriminatory actions, Plaintiffs suffered the injuries described in this Complaint.

108.   Plaintiffs are therefore entitled to injunctive relief; attorney's fees, costs, and disbursements; and money damages for the injuries and loss they sustained as a result of Defendants' discriminatory conduct as hereinbefore alleged, pursuant to the MHRA. Minn. Stat. §§ 363A.33 *et seq.* and 363A.29, subd. 4.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray that this Court grant the following relief:

A.  Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants have subjected Plaintiffs to unlawful discrimination in violation of Title III of the Americans with Disabilities Act, the Rehabilitation Act, and the MHRA;

B.   Issue an injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals, or their companions, meaningful access to and full and equal enjoyment of Defendants' facilities, services, or programs;

C.  Order Defendants:

i.   to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Plaintiffs or other deaf or hard of hearing individuals by failing to provide auxiliary aids necessary for effective communication;

    ii.    to develop, implement, promulgate, and comply with policies to ensure that Defendants will consider the communication needs of deaf individuals who participate in and attended Defendants' competitions and meetings, and will affirmatively work with deaf individuals to provide effective auxiliary aids and services, including interpreters, to make their competitions and meetings accessible;

    iii.    to implement these policies and procedures to all state, local, and regional wrestling clubs that are governed by Defendants;

    iv.    to train all their employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ADA, the RA, and the MHRA; and

D. Award to Plaintiffs:

    i.  Compensatory damages pursuant to the RA and the MHRA;

    ii.  Treble damages pursuant to the MHRA;

    iii. Punitive damages pursuant to the MHRA;

    iv. Reasonable costs and attorneys' fees pursuant to the ADA, the RA, and MHRA;

    v.  Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

    vi. Any and all other relief that this Court finds necessary and appropriate.

## **JURY DEMAND**

Plaintiffs demand trial by jury for all of the issues a jury properly may decide, and for all of the requested relief that a jury may award.

Date: <u>February 10, 2021</u>                    Respectfully submitted,

EISENBERG & BAUM, LLP
By: <u>s/ Andrew Rozynski</u>
     Andrew Rozynski, Esq.
     NY# 5054465
24 Union Square East, Fourth Floor
New York, NY 10003
Phone: (212) 353-8700
Fax: (212) 353-1708
arozynski@eandblaw.com

MINNESOTA DISABILITY LAW CENTER
By: <u>s/ Roderick J. Macpherson III</u>
     Roderick J. Macpherson III
     MN #66163
     Chad Wilson, Esq.
     MN #0398917
111 North 5th Street ~ Suite 100
Minneapolis, MN 55403
Phone: (612) 332-1441
Fax: (612) 334-5755
rjmacpherson@mylegalaid.org
cwilson@mylegalaid.org