## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

-------------------------------------------------------------

| | |
|---|---|
| DAVID NATHANSON on behalf of himself and his minor children, D.N. and G.N., | Case No. 21-cv-00385-SRN-DTS |
| Plaintiffs, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| UNITED STATES OF AMERICA WRESTLING ASSOCIATION, INC. and MINNESOTA UNITED STATES OF AMERICA WRESTLING INC., | |
| Defendants. | |

--------------------------------------------------------------

Plaintiffs David Nathanson on behalf of himself and his minor children, D.N. and G.N., submit this memorandum in support of their emergency motion for a preliminary injunction.

## **INTRODUCTION**

Plaintiffs seek a preliminary injunction requiring Defendants to immediately provide American Sign Language ("ASL") interpreters for all of their meetings, trainings, and tournaments. This case is about unlawful discrimination practiced by Defendants, The United States of America Wrestling Association, Inc. and Minnesota United States of America Wrestling Association, Inc. ("Defendants") against deaf persons in violation of their rights under: (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et*

*seq.*; (2) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehab Act"); (3) Minnesota Human Rights Act ("MHRA"), Minn. Stat. §363A.11, *et seq.*

Plaintiffs, David Nathanson, D.N., and G.N., are individuals with a disability as defined by the Americans with Disabilities Act ("ADA") and primarily communicate in ASL, which is their expressed, preferred, and most effective means of communication. *See* Compl. ¶ 1.[1] Mr. Nathanson is a wrestling coach for The ASL Eagles, a youth wrestling club chartered under the governance and bylaws of Defendants. *Id.* Mr. Nathanson's minor sons, D.N. (DOB: 1/12/2006) and G.N. (DOB: 2/22/2008) are wrestlers for The ASL Eagles. *Id.*

Plaintiffs initiated this suit against Defendants on February 10, 2021, due to Defendants' refusal to provide Plaintiffs with qualified sign language interpreters at Defendants' wrestling competitions and meetings. Without interpreters, Plaintiffs and other deaf team members cannot effectively communicate with administrators, referees, coaches, judges, competition officials, and medical staff at Defendants' events in the same manner as hearing, non-disabled coaches and participants. *See* Compl. ¶ 2. Since initiating this lawsuit, Defendants have unrelentingly continued to refuse to provide Plaintiffs with interpreters. *See* David Nathanson's Aff. ¶ 18-20. Specifically, in response to Plaintiff David Nathanson's requests, Defendants told him that they "will not be providing interpreters for the state tournament or any tournaments/meetings this year or in subsequent years." Exhibit 1 at 5. This motion requires the Court's immediate attention because

---

[1] Plaintiff David Nathanson affirmed the allegations in the Complaint as true and accurate to the best of his knowledge, information, and belief. *See* David Nathanson Aff. ¶ 2.

Defendants' actions have made it impossible for Plaintiffs to equally and safely participate in the ongoing wrestling season. For example, Plaintiffs wish to attend Defendants' upcoming "2021 Kids, Cadet & Junior State Greco/Freestyle Tournament" happening on May 1-2 and May 7-8, 2021. Nathanson Aff. ¶ 27. Plaintiffs also wish to participate in Defendants' ongoing trainings that happen on Mondays, Wednesdays, and Sundays through June of 2021. *Id.* ¶ 28.

Before last year's state tournament, Defendants paid for ASL interpreters that were arranged by the ASL Eagles *Id.* ¶ 24. Now, Defendants refuse to pay for interpreters and advise schools and venues that host local tournaments that Defendants and local tournament hosts are not responsible for providing or paying for ASL interpreters for the ASL Eagles. *Id.* ¶ 25. Because Plaintiffs will not be able to equally and safely participate in these events without the Court's intervention, it is imperative that Defendants' actions are enjoined.

<u>**ARGUMENT**</u>

To obtain preliminary injunction, Plaintiffs must show (1) a substantial likelihood of success on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) that the threatened irreparable injury outweighs the threatened harm that the injunction would cause Defendants and third parties; and (4) that granting the preliminary injunction would be in the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). While no single factor is determinative, here, all four factors decisively favor a preliminary injunction.

**I. Plaintiffs are Likely to Succeed on the Merits**

For the likely to succeed factor, "it is not necessary for the movant to prove they are more likely than not to prevail, the movant 'need only show a reasonable probability of success, that is, a fair chance of prevailing' on the merits." *Neb. Data Ctrs., LLC v. Khayet*, No. 8:17CV369, 2018 U.S. Dist. LEXIS 13521, at *10 (D. Neb. Jan. 26, 2018) (citing *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013)); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 993 (8th Cir. 2011) ("[T]he standard for preliminary injunctive relief requires a showing of a 'likelihood of success on the merits rather than actual success' as necessary for permanent relief.") (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 32-33 (2008)). Plaintiffs are likely to succeed on the merits.

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S. Code § 12182. "The ADA seeks to prevent not only intentional discrimination against people with disabilities, but also discrimination that results from 'thoughtlessness and indifference,' or, in other words, from 'benign neglect.'" *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 522 (S.D.N.Y. 2020) (citing *Alexander v. Choate*, 469 U.S. 287, 295 (1985); 42 U.S.C. § 12112(b)(5)(A) (defining discrimination to include failing to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability")). To prevail under Title III of the ADA, a plaintiff must show that: 1) the plaintiff is disabled within the meaning of the ADA, 2) the defendant is a private

entity that owns, leases, or operates a place of public accommodation, and 3) the defendant failed to make reasonable modifications that do not fundamentally alter the nature of the public accommodation. *Nathanson v. Spring Lake Park Panther Youth Football Ass'n*, 129 F. Supp. 3d 743, 747-748 (D. Minn. 2015). Here, Plaintiffs have demonstrated each of these elements.

First, Plaintiff are individuals with disabilities because they are deaf. 28 CFR § 36.105. Second, Defendants are private entities that own, lease, or operate a place of public accommodation. "[S]ports association, can meet the definition of a 'place of public accommodation.'" *Nathanson*, 129 F. Supp. 3d at 748. Thus, in a similar case by Plaintiffs against a sports association like Defendants, this Court rejected the sports association's argument that it is not a place of public accommodation, and found that Plaintiffs have "plausibly stated that the Football Association operates a place of public accommodation.'" *Nathanson*, 129 F. Supp. 3d at 748-49. Here, like the football association in *Nathanson*, Defendants are responsible for promoting, governing, and developing amateur wrestling programs in the State of Minnesota, and own, operate and/or lease gymnasiums, arenas, places of exercise, and public gatherings which are places of public accommodation as defined the ADA. *See* Compl. ¶¶ 8-10. As such, Defendants are places of public accommodation under the ADA.

Third, Defendants failed to provide reasonable accommodation to Plaintiffs or make reasonable modifications. To comply with the third element, Defendants are obligated to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication." 28 C.F.R. § 36.303(c)(1). "In order to be effective, auxiliary aids and

services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." *Id.* § 36.303(c)(1)(ii). In other words, Defendants are charged with providing "equally effective communication." U.S. Dep't of Justice, Civil Rights Div., Disability Rights Section, ADA Requirements, Effective Communication, https://bit.ly/2YeQJHX (Jan. 31, 2014), at 1. Equally effective communication "means that whatever is written or spoken must be as clear and understandable to people with disabilities as it is for people who do not have disabilities." U.S. Dep't of Justice, Title II Technical Assistance, ADA Best Practices Tool Kit for State and Local Governments – Ch. 3, A. Providing Equally Effective Communication, https://bit.ly/33aWTed (Feb. 27, 2007) (emphasis omitted).

For someone whose primary language is ASL, communicating in English is usually not effective because "ASL is not a visual representation of the English alphabet or English vocabulary. It is an entirely separate language with its own syntax and grammar that [is] described as 'closer to Chinese than English.'" *Heyer v. U.S, Bureau of Prisons*, 984 F.3d 347, 350 (4th Cir. 2021). "Unlike English, ASL has no generally accepted written form." *Id.* Rather, "ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages." *U.S. E.E.O.C. v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1105 (9th Cir. 2010). "In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language." *Id.*

Due to physical, environmental, and pedagogical factors, many deaf individuals have difficulty acquiring spoken languages such as English. *See Heyer*, 984 F.3d at 350

6

("Those born deaf or who become deaf early in life face unique barriers to learning English."). "As a result, most Deaf high-school graduates communicate in written English at the third-grade level." *Id.* This is because many deaf people acquire English as their second language (after ASL or another form of sign language) well past the critical developmental period of language acquisition. *Id.* ("Most Deaf individuals have 'limited language exposure in early childhood' and 'grow up in a linguistically impoverished and deprived environment,' making acquisition of English skills more difficult."). Thus, when an entity relies on note writing in English, the average deaf person cannot "communicate in real time" and is "required to communicate outside of their native language, with major barriers to expressing tone and emotion." *Rogers v. Colo. Dep't of Corr.*, No. 16-cv-02733-STV, 2019 U.S. Dist. LEXIS 159001, at \*46–47 (D. Colo. Sep. 18, 2019) (analyzing text telephones or "TTYs"—the functional equivalent of note writing); *see also McBride v. Mich. Dep't of Corr.,* 294 F. Supp. 3d 4 695, 707 (E.D. Mich. 2018) (reviewing "ample evidence" that for deaf and hard of hearing persons who communicate in ASL, "TTYs are not a practical or effective communication tool").

As a result, for someone whose primary language is not English, note writing is only effective when the situation "call[s] for little interactive communication." U.S. Dep't of Justice, Civil Rights Div., ADA Business BRIEF: Communicating with People Who Are Deaf or Hard of Hearing in Hospital Settings, https://bit.ly/2Oa4X8I. Consider the following examples:

> • "[S]ituations that do not involve substantial conversation" such as "blood work for routine lab tests or regular allergy shots," 28 C.F.R. Part 35 App. A.

and

• "[B]rief and relatively simple face-to-face conversations, such as a visitor's inquiry about a patient's room number or a purchase in the gift shop or cafeteria." U.S. Dep't of Justice, Civil Rights Div., ADA Business BRIEF: Communicating with People Who Are Deaf or Hard of Hearing in Hospital Settings, https://bit.ly/2Oa4X8I.

But "[f]or more complex or lengthy exchanges, more advanced aids and services are required"—not suggested, but required. U.S. Dep't of Justice, Title II Technical Assistance, ADA Best Practices Tool Kit for State and Local Governments – Ch. 3, A. Providing Equally Effective Communication, https://bit.ly/33aWTed (Feb. 27, 2007). Thus, if someone "has a disability that affects communication," then "auxiliary aids and services such as qualified interpreters" are the kind of advanced aids and services the DOJ mandates. For example, "[i]n a retail setting, pointing to product information or writing notes back and forth to answer simple questions about a product may allow a person who is deaf to decide whether to purchase the product"; however, where more complex information is communicated, like "[i]n a doctor's office, an interpreter generally will be needed for taking the medical history of a patient who uses sign language or for discussing a serious diagnosis and its treatment options." U.S. Dep't of Justice, Effective Communication, https://www.ada.gov/effective-comm.htm (Jan. 31, 2014). *see also Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 837 n.8 (11th Cir. 2017) ("[T]he exchange of written notes is not appropriate 'when the matter involves more complexity, such as in communication of medical history or diagnoses, in conversations about medical procedures and treatment decisions, or in communication of instructions for care at home or

elsewhere.'") (quoting 28 C.F.R. Pt. 36, App. A (Sept. 15, 2010)); *see also Bustos v. Dignity Health*, 2019 U. S. Dist. LEXIS 129969, *7-8, 2019 WL 3532158 ("For instance, a deaf patient 'may need a qualified interpreter to discuss with hospital personnel a diagnosis, procedures, tests, treatment options, surgery, or prescribed medication[,]" whereas a person with the same disability 'who purchases an item in the hospital gift shop may need only an exchange of written notes to achieve effective communication.'") (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 n.5 (11th Cir. 2012)). In sum, "[t]o deny a deaf person an ASL interpreter, when ASL is their primary language, is akin to denying a Spanish interpreter to a person who speaks Spanish as their primary language." *Updike v. Multnomah Cty.*, 870 F.3d 939, 958 (9th Cir. 2017).

Thus, courts across the nation have recently found the likelihood of success element satisfied where no ASL interpreters were provided to deaf individuals. For example, in *Martinez v. Cuomo*, the court granted the deaf plaintiffs' motion for a preliminary injunction against Governor Cuomo of New York to provide an in-frame ASL interpreter during televised broadcast briefings. 459 F. Supp. 3d at 520. Governor Cuomo argued that existing accommodations, such as closed captioning, ensured meaningful access. *Id.* at 523-24. The court disagreed however, stressing that "live broadcasts with closed captioning, while perhaps accommodating deaf New Yorkers who are fully literate in English, do not accommodate Plaintiffs and other similar deaf New Yorkers who cannot read English." *Id.* at 524-25. Thus, the court held that "Plaintiffs have established that, despite the accommodations currently offered, they cannot access Governor Cuomo's briefings without an in-frame ASL interpreter and have therefore demonstrated a likelihood

of success on the merits." *Id.* at 525-26. The district court for the District of Columbia also agreed with *Martinez* in requiring the White House to provide an ASL interpreter for its briefings: "Closed captioning and transcripts may constitute a reasonable accommodation under some circumstances, but not here . . . these 'accommodations — however well-intentioned — simply do not provide 'meaningful access in the circumstances [presented] here.'" *Nat'l Ass'n of the Deaf v. Trump*, No. 20-2107 (JEB), 2020 U.S. Dist. LEXIS 164168, at *28 (D.D.C Sep. 9, 2020) (citing *Martinez*, 459 F. Supp. 3d 517). The district court then held that "[t]his is enough for Plaintiffs to establish a likelihood of success on the merits of their Rehabilitation Act count." *Id.* at *29. The same analysis applies here.

Here, Defendants do not provide ASL interpreters to Plaintiffs in their trainings, meetings, and tournaments in violation of the ADA. Plaintiff David Nathanson communicated effectively in tournaments with ASL interpreters, but not in tournaments where no interpreter was provided. Nathanson Aff. ¶ 22. Defendants recognize that interpreters are a necessary auxiliary aid for Plaintiffs because they used to pay for the ASL interpreters arranged by The ASL Eagles until before the last year's state tournament. *Id.* ¶ 24. It is Defendants who have changed the status quo, not Plaintiffs.

To be sure, Plaintiff David Nathanson must attend various training and board meetings held by Defendants to stay up to date with the latest wrestling rules, regulations and news within Defendants' organizations. *See* Compl. ¶ 25; Nathanson Aff. ¶¶ 15-16. Defendants do not provide interpreters or captioning during the meetings or trainings. Nathanson Aff. ¶¶ 15-17. Plaintiff David Nathanson requires an ASL interpreter during these complex and lengthy meetings and trainings to understand what is being

communicated and to ask questions as well. *See* Compl. ¶ 25; Nathanson Aff. ¶¶ 16-17. Because there were no interpreters, Plaintiff David Nathanson could not participate in many trainings and meetings. Nathanson Aff. ¶¶ 17-19; Compl. ¶60-63. Even during wresting competitions, coaches constantly have to communicate with tournament referees, judges, announcers, other officials, and coaches from competing teams. *See* Compl. ¶ 23. When Plaintiff David Nathanson cannot communicate effectively with tournament officials or referees, his wrestlers can face significant disadvantages during the matches compared to other hearing players. *See* Nathanson Aff. ¶ 13. His wrestlers could get points taken off or lose a match if communications are not effective. *Id.*

Plaintiffs D.N. and G.N. and other wrestlers must understand the rulings and instructions made by officials during the matches. *See* Compl. ¶ 28. These communications are complex and fast-paced as the communications typically happen during an ongoing wrestling match. *See* Compl. ¶ 28. Also, announcers often make announcements over an intercom speaker to communicate the time and location of where a player is to compete. *See* Compl. ¶ 30. As the courts in *Cuomo* and *Trump* found, written English is not an effective form of communication in the competition setting because writing does not allow Plaintiffs to communicate in real time during ongoing matches and requires them to communicate outside of their native language. *See* Compl. ¶ 31. Moreover, wrestlers can get severely injured during wrestling competitions because wrestling is an extremely physical and dangerous sport. *See* Compl. ¶ 24; Nathanson Aff. ¶ 14. Medical communications are complex and the injured players must be able to communicate effectively with medical professionals for timely and effective treatment. *See* Compl. ¶ 24;

Nathanson Aff. ¶ 14. As explained above, writing in English is not an effective method of communication in medical settings. Plaintiffs D.N. and G.N. and the injured deaf players are, thus, exposed to greater safety risks than their peers. As such, Plaintiffs have been denied the opportunity to benefit from Defendants' programs equal to that of their nondisabled peers.

Even assuming that note writing in English is an appropriate auxiliary aid, —which is not the case—Defendants still violated the law because they treated Plaintiffs differently from nondisabled peers. Defendants "must provide auxiliary aids and services to individuals with disabilities if such individuals need those aids and services to enjoy 'meaningful access' to the public accommodation." *Childress v. Fox Assocs., LLC*, 932 F.3d 1165, 1170-1171 (8th Cir. 2019) (citing *Argenyi v. Creighton Univ.*, 703 F.3d 441, 449 (8th Cir. 2013)). A deaf person "receives meaningful access if she receives an 'equal opportunity to gain the same benefit' as a person without [] disability." *Id.* Thus, even a public accommodation that provides an appropriate type of auxiliary aid still violates the law if deaf individuals are treated differently. *Id.*

In *Childress*, the Eighth Circuit affirmed the district court's grant of summary judgment for the deaf plaintiffs where the defendant Fox Theater offered the appropriate auxiliary aid—captioning—but only on selected dates. *Id.* at 1173. The district court "found that failing to offer captioning at any performance where captions were requested 'results in deaf persons being excluded, denied services, or otherwise treated differently than other individuals merely because of the absence of [an auxiliary] aid. This failure violates 42 U.S.C. § 12182(b)(2)(A)(iii).'" *Id.* at 1170 (alteration in original). The Eighth

Circuit affirmed that such different treatment violates the law: "the Fox's one-captioned-performance policy denies persons with hearing impairments an *equal opportunity to gain the same benefit* as persons without hearing impairments, and that deaf and hard-of-hearing individuals therefore do not have *meaningful access to the benefits* the Fox provides." *Id.* at 1173 (emphasis added).

Here, like the defendant in *Childress*, Defendants treated Plaintiffs differently than nondisabled peers. As explained above, Plaintiff David Nathanson cannot attend or participate in Defendants' various meetings, trainings, and tournament settings at the same time or in the equal manner because of Defendants' failure to provide interpreters. *See* Compl. ¶ 25; Nathanson Aff. ¶¶ 9-22. He cannot listen to the questions, discussions, and concerns of other coaches and members present in these meetings. *See* Nathanson Aff. ¶¶ 12-22. Nor can he participate in the discussions or ask questions during these meetings. *Id.* Also, Plaintiffs D.N. and G.N. and other deaf wrestlers do not have the equal opportunity to gain the same benefit from Defendants' programs. Wresters must understand the rulings and instructions made by officials during the matches. *See* Compl. ¶ 28. These communications are complex and fast-paced as the communications typically happen during an ongoing wrestling match. *See* Compl. ¶ 28. Note writing in English does not allow Plaintiffs to communicate in real time during ongoing matches and requires them to communicate outside of their native language. *See* Compl. ¶ 31. An ineffective communication may unduly prejudice deaf wrestlers and impact the result of the match. *See* Nathanson Aff. ¶ 13. Moreover, Plaintiffs cannot effectively communicate with medical staff if anyone gets injured during the matches. *See* Compl. ¶ 24; Nathanson Aff.

¶ 14. Thus, Plaintiffs D.N. and G.N. and other deaf children are exposed to greater safety risks compared to hearing children. As such, Defendants' different treatment of Plaintiffs denied Plaintiffs "an equal opportunity to gain the same benefit as persons without hearing impairments," and thus, Plaintiffs do "not have meaningful access to the benefits [Defendant] provide[d]." *Childress*, 923 F.3d at 1173.

If Defendants' liability is still not clear, Defendants further violated their affirmative duty to assess the accommodation needs of Plaintiffs. *See Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 268-269 (D.D.C. 2015) (finding that Title II and the RA impose an affirmative duty to evaluate the accommodation needs of people with disabilities); *Updike v. Multnomah Cty.*, 870 F.3d 939, 954 (9th Cir. 2017) (same).

Even assuming that Plaintiffs preferred to write notes over sign language—which is not the case—Defendant still violated the law here because they failed to take any affirmative steps to evaluate Plaintiffs' level of English before deciding to write notes to them in English. Plaintiffs are profoundly deaf individuals whose first and primary language is ASL. *See* Compl. ¶ 13. Defendants had "an affirmative duty to evaluate [Plaintiffs'] accommodation requirements, and [their] failure to do so constituted disability discrimination as a matter of law." *See Pierce*, 128 F. Supp. 3d at 268-269. For all these reasons, Plaintiffs have sufficiently shown their reasonable probability of success on the merits.

## II.   Plaintiffs Will Suffer Irreparable Harm if Defendants Are Not Enjoined

Absent a preliminary injunction requiring ASL interpretation by Defendants, Plaintiffs will suffer irreparable harm. Irreparable harm is defined as certain imminent harm

for which a monetary award does not adequately compensate and there is a substantial chance that upon final resolution of the action, a party cannot be returned to the position it previously occupied. *See Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017)*; Lyon v. Ill. High Sch. Ass'n,* No. 13 C 173, 2013 U.S. Dist. LEXIS 10548, at *14 (N.D. Ill. Jan. 25, 2013) (determining that monetary compensation cannot be a substitute for the experience of participating in the state wrestling tournament). Here, the irreparable harm Plaintiffs will suffer is the lost opportunity to participate in the ongoing wrestling season, thus a preliminary injunction is warranted.

District courts in the Eight Circuit and throughout the country have determined that a lost opportunity to participate in a sport constitutes as irreparable harm. *See Elitt v. U.S.A. Hockey*, 922 F. Supp. 217, 224 (E.D. Mo. 1996); *see also Tatum v. NCAA*, 992 F. Supp. 1114, 1121-22 (E.D. Mo. 1998) (finding that a loss of athletic eligibility can constitute irreparable harm*; McFadden v. Grasmick*, 485 F. Supp. 2d 642, 646-647 (D. Md. 2007) (denying a disabled individual the opportunity to earn points as a member of her track team constituted as irreparable harm); *Rademaker v. Blair*, No. 10-3332, 2010 U.S. Dist. LEXIS 135306, at *13 (C.D. Ill. Dec. 22, 2010) (denying a disabled individual the opportunity to play basketball as a part of the team can constitute as a negative physical and emotional impact on a person which can present the possibility of irreparable harm); *Dennin v. Conn. Interscholastic Ath. Conference*, 913 F. Supp. 663, 667 (D. Conn. 1996), *appeal dismissed as moot by* 94 F.3d 96 (2d Cir. 1996) (finding that a school policy allowing a disabled student to participate in school swim meets without the opportunity to earn points resulted in irreparable harm).

In *Ellit*, plaintiffs, a son and his parents, filed an action under the ADA, against defendants, a hockey club and an umbrella organization, requesting a preliminary injunction to compel the son's participation in the hockey club. 922 F. Supp. 217 at 218. The son, Mark Elitt was speech impaired and diagnosed with Attention Deficit Disorder. *Id.* at 218. Plaintiffs requested that special accommodation be made by defendants to allow either one of Mark's family members to be on the ice with Mark during practices and scrimmages. *Id.* Furthermore, plaintiffs requested that Mark be allowed to participate in a lower age group. *Id.* The district court in this matter found that the plaintiffs showed a threat to irreparable harm because without special accommodations, Mark could lose the opportunity to participate in the upcoming hockey season. *Id.* at 224.

Similarly, absent a preliminary injunction, Plaintiffs will not be able to participate in the ongoing season and will miss opportunities to compete for regional and state titles. Mr. Nathanson has reached out to Defendants several times before and after initiating the current suit to request interpreters for Defendants' organizational meetings and wrestling matches. *See* Compl. ¶¶ 34-63; Nathanson Aff. ¶ 18; Exhibit 1. Despite these requests, Defendants have relentlessly refused to provide Plaintiffs with interpreters. *Id.* Specifically, Defendants told Mr. Nathanson that they "will not be providing interpreters for the state tournament or any tournaments/meetings this year or in subsequent years." Exhibit 1 at 5. Notably, Defendants refused to provide Mr. Nathanson with interpreters during recent organizational meetings. Nathanson Aff. ¶¶ 18-20; Exhibit 1. Due to this refusal, Mr. Nathanson was unable to attend the meetings and was not updated with the new registration processes for upcoming state tournaments. *Id.* Accordingly, Mr.

Nathanson was unable to register his youth wrestlers for the Minnesota state wrestling tournaments held on March 5-7, 2021 and March 12-14, 2021. *Id.* Moreover, Plaintiffs cannot equally participate in the upcoming events. Plaintiffs wish to attend Defendants' upcoming "2021 Kids, Cadet & Junior State Greco/Freestyle Tournament" happening on May 1-2 and May 7-8, 2021. Nathanson Aff. ¶ 27. Plaintiffs also wish to participate in Defendants' ongoing trainings that happen on Mondays, Wednesdays, and Sundays through June of 2021. *Id.* ¶ 28.

Additionally, as stated, Plaintiffs cannot compete in wrestling tournaments without an interpreter. Without interpreters, Plaintiffs will not be able to compete in any upcoming competitions because they will not be able to participate in the same manner as hearing, non-disabled individuals. Defendants have suggested that Plaintiffs bring their own interpreter. *See* Exhibit 1. First, this request is a violation of the law, as a public entity "shall not require an individual with a disability to bring another individual to interpret for him or her." 28 C.F.R. § 36.303(c)(2). Secondly, many interpreter agencies do not want to contract with the ASL Eagles due to a past incident when an agency interpreted for the club and Defendants refused to pay for the accommodation. *See* Compl. ¶¶ 48-56; Nathanson Aff. ¶ 21; Exhibit 1 at 2. Defendants' wrestling season is ongoing. When Plaintiffs miss a wrestling tournament, Plaintiffs permanently miss opportunities to compete in this wrestling season. Accordingly, Plaintiffs have undoubtedly shown imminent, irreparable harm that cannot be compensated.

### III.   The Balance Of Hardships Weigh Heavily In Favor Of Plaintiffs

The irreparable harm to Plaintiffs significantly outweighs any potential harm to Defendants. *Laclede Gas Co. v. St. Charles Cty.,* 713 F.3d 413 (8th Cir. 2013). If injunctive relief is granted, deaf coaches and wrestlers will be able to compete in the ongoing season in the same manner that their hearing counterparts are able to compete. Without an interpreter, Plaintiffs **cannot** equally participate in Defendants' meetings and competitions. Youth deaf wrestlers will not be able to compete in competitions in the same manner as non-disabled hearing children because they cannot hear whistles, hear ruling from officiants, or hear announcements over the intercom. David Nathanson equally will not be able to hear the aforementioned and will not be able to communicate and advocate for his team in the same manner as non-disabled hearing coaches. Without an interpreter, Plaintiffs will continue to lose opportunities to compete in various tournaments and will continue to suffer emotional harm. Plaintiff David Nathanson communicated effectively in tournaments with ASL interpreters, but not in tournaments where no interpreter was provided. Nathanson Aff. ¶ 22.

In contrast, Defendants will suffer relatively little harm, if any, when injunctive relief is granted. Instead, providing interpreters can greatly benefit Defendants' organization. Interpreters will actually contribute to the flow of Defendants' meetings and competitions and allow the conversations and information to be communicated and received in "real time." Interpreters will prevent unnecessary delays and confusion during both the competitions and meetings, which will ensure efficient competitions and equality amongst all participants. Before last year, Defendants fulfilled Plaintiffs' requests for ASL interpreters and provided interpreters at Defendants' wrestling tournaments or paid for

interpreters that were arranged by The ASL Eagles Aff. ¶ 24. It is evident that Defendants have the means and resources to provide ASL interpreters to Plaintiffs and also recognize that interpreters are a necessary auxiliary aid for Plaintiffs. Again, it is Defendants who have changed the status quo, not Plaintiffs.

## IV.     The Public Interest will be Advanced by the Provision of Preliminary Relief

Providing interpreters to Plaintiffs undeniably serves the public interest: "The public interest favors enforcing the ADA, a remedial statute against discrimination, which furthers the public policy of a 'clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Smith v. Hartmann's Moonshine Shoppe, LLC*, No. 17-4211 (MJD/LIB), 2019 U.S. Dist. LEXIS 171710, at *9 (D. Minn. Oct. 3, 2019) (citing 42 U.S.C. § 12101(b)(1)). In enacting the ADA, Congress stressed that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]"42 U.S.C. § 12101(a)(2). Further, "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011) (citing 42 U.S.C. § 12101(a)(9)). "This public interest is served by requiring entities to take steps to 'assure equality of opportunity' for people with disabilities." *Id.* (citing 42 U.S.C. § 12101(a)(12101(a)(8)); *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) ("[P]ublic interest strongly favors mandating

accessibility" for the disabled plaintiffs); *Jones v. City of Monroe*, 341 F.3d 474, 490 (6th Cir. 2003) ("The public interest is clearly served by eliminating the discrimination Congress sought to prevent in passing the ADA."); *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007) ("[I]t is always in the public interest to protect constitutional rights."); *Heather K. v. City of Mallard*, 887 F. Supp. 1249, 1266 (N.D. Iowa 1995) ("In light of this legislative history, the public interest is served by enforcement of anti-discrimination provisions of Title II of the ADA.").

Here, Plaintiffs are requesting interpreters so that they—and the deaf children in the ASL Eagles—can equally and safely participate in Defendants' wrestling programs like any other hearing individuals. Absent interpreters, Plaintiff David Nathanson cannot get the same training and information as other coaches do. As a result, deaf children are denied the equal information, opportunity, and access to Defendants' programs. Absent interpreters, deaf children are unfairly disadvantaged in the wrestling matches as they may get their points taken off or lose a match. Absent interpreters, deaf children are exposed to greater safety risks compared to hearing children because medical communications are difficult for deaf people without interpreters. Without a doubt, it is in the public's interest to ensure that all children, including deaf children, have the equal opportunity, information, access, and safety measures in Defendants' wrestling programs. To do so otherwise, it would perpetuate the discrimination the ADA sought to address.

## **CONCLUSION**

For these reasons, the Court should issue a preliminary injunction requiring Defendants to immediately provide ASL interpreters for all of their meetings, trainings, and tournaments.


Dated: April 9, 2021                    Respectfully submitted,

                                        **MINNESOTA DISABILITY LAW CENTER**

                                        By: <u>s/ Roderick J. Macpherson III</u>
                                        Roderick J. Macpherson III
                                        MN #66163
                                        Chad Wilson, Esq.
                                        MN #0398917
                                        111 N. Fifth St.
                                        Suite 100
                                        Minneapolis, MN
                                        Phone: (612) 332-1441
                                        Fax: (612) 334-5755
                                        rjmacpherson@mylegalaid.org
                                        cwilson@mylegalaid.org

                                        **EISENBERG & BAUM, LLP**

                                        By:
                                        Andrew Rozynski, Esq.
                                        24 Union Square East, Penthouse
                                        New York, NY 10003
                                        Telephone: (212) 353-8700
                                        Fax: (917) 591-2875
                                        arozynski@eandblaw.com

                                        *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

On April 9, 2021, I electronically filed this document with the Clerk's Office using the CM/ECF system, which then sent a Notice of Electronic Filing to all registered attorneys.

Dated: April 9, 2021

Respectfully submitted,
By:

Andrew Rozynski, Esq.
EISENBERG & BAUM, LLP
24 Union Square East, Penthouse
New York, NY 10003
Telephone: (212) 353-8700
Fax: (917) 591-2875
arozynski@eandblaw.com

*Attorneys for Plaintiff*